IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CARLOS ISMAEL NUNEZ BARDALES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | NO. 3:18-cv-00600 |
| | ) | |
| BREIDY MARIA CRUZ LAMOTHE, | ) | JUDGE RICHARDSON |
| | ) | |
| Respondent. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Respondent Breidy Maria Cruz Lamothe removed her minor child, JINC, from his home in Honduras and brought him to the United States. JINC's father, Petitioner Carlos Ismael Nunez Bardales, filed a Petition under the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention") seeking the return of JINC. On August 13, 2019, the Court held a bench trial on the Petition, after which the parties were instructed to file proposed findings of fact and conclusions of law. Those proposed findings of fact were filed on September 11, 2019.

Having reviewed the parties' proposed findings of fact and conclusions of law, the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law. Except where the Court discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts that it deems to be immaterial to the issues presented.

**FINDINGS OF FACT**

Respondent Breidy Maria Cruz Lamothe ("Respondent") and Carlos Ismael Nunez Bardales ("Petitioner") are both Honduran citizens. After a period of dating, Petitioner and

1

Respondent had a child together, JINC, who was born on July 21, 2015. Petitioner, Respondent, and JINC lived together in San Pedro Sula, Honduras after JINC's birth. In February 2017, Petitioner and Respondent broke up, and moved into different homes. JINC resided with Respondent; however, Respondent dropped JINC off at Petitioner's home five days a week while Respondent worked.

In July 2017, Respondent told Petitioner that she was taking JINC on a vacation to visit her sister in Catacamas Olancho, Honduras. Respondent actually planned to remove JINC to the United States. Respondent and JINC entered the United States on July 14, 2017, via the land border between the United States and Mexico and they arrived in Nashville, Tennessee on July 29, 2017. During this time, Petitioner became concerned when Respondent stopped responding to his calls and text messages. Respondent eventually texted Petitioner, informing him that she had taken JINC to the United States. JINC was two years old at the time. On July 24, 2017, Petitioner sought assistance from the Honduran Central Authority and submitted a Hague application for return of the child to the United States Department of State. (Doc. No. 1-5). On July 2, 2018, Petitioner filed a Petition for Return of Minor Child to Petitioner (Doc. No. 1) under the Convention, asserting that Respondent wrongfully removed JINC from Honduras and seeking JINC's prompt return.

The Court held a bench trial on the matter on August 13, 2019. Prior to trial, the parties stipulated to the applicability of the Convention and also stipulated to the following facts: (1) JINC is under the age of sixteen; (2) JINC's habitual residence at the time of removal was Honduras; (3) Respondent and JINC entered the United States on July 14, 2017, via the land border between the United States and Mexico, and Respondent did not tell the Petitioner she had removed the child from Honduras; (4) Petitioner filed his Petition within one year of his knowledge of the wrongful removal; (5) Petitioner is the father of JINC. (Doc. No. 38 at 3).

Each party was represented by counsel at the bench trial.[1] The only two witnesses at trial were Petitioner and Respondent. Their respective accounts of their relationship, and of Petitioner's involvement in JINC's life, differ greatly from one another. Petitioner maintained that after the parties stopped living together, they shared equal time with JINC and he financially supported, cooked for, fed, bathed, diapered, clothed, played with, read to, and taught JINC. Respondent testified that Petitioner was an angry and aggressive person who stalked her and pulled a loaded firearm on her while JINC was in the room. Respondent also testified that after the couple separated, Petitioner stopped providing any care to JINC, financially or otherwise. Although Respondent admitted that she did drop JINC off at Petitioner's house while she worked, she testified that it was her belief that a babysitter or Petitioner's mother, rather than Petitioner, watched JINC while he was there.

## CONCLUSIONS OF LAW

**I. The Convention**

In 1980, at the Hague Conference on Private International Law, twenty-nine states ("Contracting States") convened and enacted the Hague Convention in order to accomplish the following objectives: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State"; and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Convention art. 1. The United States and Honduras are both signatories to the Hague Convention. Congress ratified and implemented the Convention by enacting the International Child Abduction Remedies Act ("ICARA"). The Convention and ICARA seek to "preserve the status quo and to deter parents

---

[1] The Court understands that counsel were representing their respective clients on a no-fee or reduced-fee basis. Counsel are to be commended for their advocacy in this case, whereby they made a substantial contribution to the administration of justice under the principles of the Hague Convention.

from crossing international boundaries in search of a more sympathetic court." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (hereinafter "*Friedrich I*") (citation omitted).

This Court "has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063–64 (6th Cir. 1996) (hereinafter "*Friedrich II*") (citing Convention, Article 19). The sole issue is whether a child has been wrongfully removed from his or her habitual residence. *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir. 2000). Article 3 of the Convention defines wrongful removal or retention as follows:

> The removal or the retention of a child is to be considered wrongful where—
>
> (a) [the retention of the child] is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention art. 3. If the Court determines that the removal was wrongful, and that no exception applies, then the Court "shall order the return of the child forthwith." *Id*. at art. 12.

**II. Evidentiary Issue**

First the Court must resolve an evidentiary issue with respect to Petitioner's Exhibit 6. Petitioner's Exhibit 6 contains excerpts of the Honduran family code in Spanish ("the Spanish version") and an English translation of those excerpts ("the English version"). At trial, Respondent objected to Petitioner's proposed Exhibit 6 on the ground that it was not properly authenticated. Respondent also complained of grammatically incorrect sentences in the English version of the Code. The Court instructed the federal court-certified interpreter to conduct an impromptu reading into the record of an English translation of the Spanish version of Petitioner's Exhibit 6, and subsequently ordered Petitioner to submit post-trial filings with respect to authenticating the exhibit.

"The language of the Convention [ ] authorizes courts to 'take notice directly of the law of [ . . . ] the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.'" *March v. Levine*, 136 F. Supp. 2d 831, 834 (M.D. Tenn. 2000) (citing Convention, art. 14), *aff'd*, 249 F.3d 462 (6th Cir. 2001). Additionally, under ICARA, no authentication of documents or information included with a petition under the Convention "shall be required in order for the . . . document[] or information to be admissible in court." 42 U.S.C. § 11605.

Relying on the above-mentioned principles, district courts often take judicial notice of the law of the state of habitual residence without requiring authentication. *See De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1196 n.15 (M.D. Fla. 2016) (explaining that during the bench trial the district court overruled respondent's objection that the translated excerpts from the Civil Code for the State of Guanajuato were not authenticated because pursuant to ICARA and the Hague Convention, a court is authorized to take judicial notice of foreign law without requiring proper authentication); *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 908 (N.D. Ill. 2015) (taking "judicial notice of the translated excerpts of the Civil Code for the State of Jalisco, Mexico, provided by Petitioner."); *Seaman v. Peterson*, 762 F. Supp. 2d 1363, 1379 (M.D. Ga. 2011), *aff'd*, 766 F.3d 1252 (11th Cir. 2014) ("[T]he Court takes judicial notice of the translated excerpts of the Civil Code for the State of Jalisco, Mexico[.]").

Although Respondent's concerns regarding that accuracy of the English translation in Petitioner's Exhibit 6 are valid ones; here, those concerns are sufficiently alleviated here. When comparing Petitioner's Exhibit 6 with other translations of the same law, including translations used by other federal courts, the Court observes that any differences in the translation are trivial. In fact, comparing Petitioner's Exhibit 6 with two other district court's recitation of the pertinent

Honduran law in Hague Convention cases, the translations all are exactly the same. *See Mendieta Chirinos v. Umanzor*, No. 3:18-cv-2668-M, 2019 WL 2287975, at *5 (N.D. Tex. May 29, 2019) (discussing translation of the Honduran Family Code articles 101, 186, 187, and 191); *Orellana v. Cartagena*, No. 3:16-cv-444-CCS, 2017 WL 5586374, at *6 (E.D. Tenn. Nov. 20, 2017) (discussing translation of the Honduran Family Code articles 109, 186, and 187). Moreover, as noted, the court-certified interpreter translated the Spanish version into English on the record during the bench trial. The discrepancies between that English translation and the English version Petitioner's Exhibit 6 are insubstantial and reflect mere differences in phrasing rather than differences in the actual substantive meaning. Accordingly, the Court judicially notices the authenticity of Petitioner's Exhibit 6 and will use the Honduran law as translated in Petitioner's Exhibit 6 to determine whether Petitioner proved his prima facie case.[2]

### III. Petitioner's Prima Facie Case

To make out a prima facie case of wrongful removal, the Petitioner must show, by a preponderance of the evidence, that (1) JINC's habitual residence was Honduras at the time of the removal or retention; (2) the removal or retention was in breach of Petitioner's custody rights under the laws of Honduras; and (3) Petitioner was exercising those rights at the time of the removal or retention. *Friedrich I*, 983 F.2d at 1400. If Petitioner can make this showing, then JINC is "to be promptly returned unless one of the narrow exceptions set forth in the convention applies." 42 U.S.C. § 11601(a)(4). The parties have stipulated that JINC's habitual residence at the time of removal was Honduras for the purposes of the Convention. (Doc. No. 38 at 3). Accordingly, the issues before the Court are: (1) whether JINC's removal was in breach of Petitioner's custody

---

[2] At the bench trial, the Court postponed ruling on the admissibility of Petitioner's Exhibit 6 and allowed Petitioner to file a post-trial brief regarding the admissibility of Petitioner's Exhibit 6. The Court now deems Petitioner's Exhibit 6 admitted.

rights under the laws of Honduras; and, if so, (2) whether Petitioner was exercising his custody rights at the time of removal.

*i. Whether JINC's Removal Breached Petitioner's Rights of Custody.*

Petitioner must establish by a preponderance of the evidence that JINC's removal was in violation of Petitioner's custody rights as defined by Honduran law. *See* Convention, art. 3. "The Convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quoting Convention, art. 5(a)). Rights of custody arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, art. 3. Further, breach of rights of custody are determined by the law of the State in which the child was a habitual resident immediately before retention. *Id*.

Here, Petitioner must (and does) rely on operation of Honduran law, rather than any agreement or judicial or administrative decision. Specifically, he relies on Article 187 of the Honduran Family Code, which provides that "parental authority belongs to both parents jointly. However, it will exercise one of them[3] when it is conferred by the court or the other was in impossibility to exercise it." (Doc. No. 1-3 at 1). "Parents in the exercise of parental authority have the right to exercise guidance, care and correction of their children, and provide them in line with the evolution of their physical and mental faculties, the direction and guidance that is appropriate for their development." (*Id*. at 2 (translating Honduran Family Code, Art. 191)). "If parental authority is exercised by both parents, the written authorization of the other is required if just one parent is traveling with the child during the trip." (*Id*. (translating Honduran Family Code, Art.

---

[3] The Court believes, based on the context, that "it will exercise one of them" actually should be construed as, "one parent alone may exercise parental authority."

7

101)). Therefore, "Honduran law provides that, when both parents exercise parental authority, each parent has a *ne exeat* right: a right to consent before the other parent can take the child out of the country." *Mendieta Chirinos*, 2019 WL 2887975, at *5. "A *ne exeat* right is a right of custody under the Convention." *Abbott*, 560 U.S. at 10.

In *Abbott*, a Chilean court granted the mother daily control of the child and granted the father visitation. *Id*. at 6. A Chilean statute provided that once a parent is granted visitation rights, a *ne exeat* right is conferred that requires a parent to obtain permission from the other parent before removing the child from the country. *Id*. The U.S. Supreme Court explained that "[t]he Convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.' Art. 5(a), *ibid*. Mr. Abbott's *ne exeat* right gives him both the joint 'right to determine the child's place of residence" and joint "rights relating to the care of the person of the child.'" *Id*. at 10-11. Therefore, the Supreme Court held that Mr. Abbott's *ne exeat* right was a right of custody as defined by the Convention.. *Id*. at 10.

In *Mendieta Chirinos*, a district court examined the Honduran Family Code and determined that because the Code requires written authorization if just one parent is traveling with the child outside of Honduras, the Code provides a "*ne exeat* right, which is a right of custody under the Hague Convention." 2019 WL 2287975, at *7. In *Orellana*, another district court reviewed the Honduran Family Code and explained that because "Respondent did not receive a custody order from any Honduras court granting full custody . . . . Petitioner is the Child's father [and] the Court finds that he has proven by a preponderance of the evidence that under Honduran law, both he and Respondent have custody rights over the child." 2017 WL 5586374, at *6.

As noted above, under the Honduran code, "parental authority belongs to both parents jointly. However, it will exercise one of them when it is conferred by the court or the other was in impossibility to exercise it." (Doc. No. 1-3 at 1). Here, the parties stipulated that Petitioner was the father of the child. Moreover, there is nothing in the record that indicates a Honduran court granted full custody to Respondent, and it was not impossible for Petitioner to exercise parental authority; indeed, as determined below, he did in fact exercise his parental authority. Therefore, Petitioner possessed parental authority jointly with Respondent. "If parental authority is exercised by both parents, the written authorization of the other is required if just one parent is traveling with the child during the trip." (*Id.* (translating Honduran Family Code, Art. 101)). The Supreme Court has held that such a *ne exeat* right is a right of custody as defined by the Convention. *Abbott*, 560 U.S. at 10. Therefore, Petitioner possessed rights of custody over JINC at the time of his removal from Honduras. The parties also stipulated that Respondent removed JINC to the United States on July 14, 2017, without informing Petitioner she was removing the child from Honduras. Because Respondent did not receive Petitioner's written authorization before removing JINC from Honduras, JINC's removal was in breach of Petitioner's custody rights. Therefore, Petitioner has proved by a preponderance of the evidence that JINC's removal was in breach of his custody rights granted by Honduran law.

*ii. Whether Petitioner Exercised His Custody Rights.*

Next, Petitioner must prove by a preponderance of the evidence that he was exercising his rights of custody at the time of the wrongful removal. Convention art. 3(b). Once a petitioner has established that he or she has custody rights under the laws of the country of habitual residence, courts must "liberally" find the exercise of those custody rights. *Friedrich II*, 78 F.3d at 1065. This liberal approach to finding whether a petitioner exercised his or her custody rights helps courts to

refrain from addressing the merits of the underlying custody dispute and "completely avoid [] the question of whether [Petitioner] exercised the custody rights well or badly." *Id*. at 1066; 42 U.S.C. § 11601(b)(4) (limiting the scope of U.S. Courts to determining "rights under the Convention and not the merits of any underlying child custody claims.").[4] Therefore, courts may "liberally find 'exercise' whenever a party with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id*. at 1065. The Sixth Circuit has further explained:

> [i]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child*. Once it determines that the parent actually exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised those rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal court.

*Id*. at 1066 (emphasis added).

At trial, Petitioner and Respondent offered conflicting testimony with respect to the amount of involvement of Petitioner in JINC's life. Respondent does not appear to contest that Petitioner exercised his custody rights until the end of their relationship. After the relationship ended, however, Respondent testified that Petitioner stopped providing any care to JINC and refused to help with JINC's expenses. She testified that she dropped JINC off at Petitioner's house when she went to work five days a week, but contended that Petitioner's mother or a babysitter, and not Petitioner, cared for JINC while he was there.

On the other hand, Respondent testified he was very involved in JINC's life, both prior to and after the relationship ended. Petitioner testified that he cared for JINC five days a week while Respondent was at work. Petitioner explained that he helped feed, bath, diaper, and cloth JINC.

---

[4] This means, among other things, that a court should not find the *absence* of the exercise of rights of custody because the court is *unimpressed* with the manner in which, or the degree to which, those rights were being exercised. It is one thing to exercise rights in a lackluster, lazy or uninspired manner; it is quite another to not exercise them at all.

Additionally, he testified that he helped to financially support JINC. Although admitting that his mother and a babysitter did care for JINC when he had to work, he claimed he paid them for childcare.

Although there are disputes regarding the extent of the care that Petitioner provided to JINC, there was no testimony from Petitioner or Respondent of acts that could constitute "clear and unequivocal abandonment" of JINC on the part of the Petitioner. *Friedrich II*, 78 F.3d at 1066. Respondent's allegations of Petitioner's lack of hands-on care for JINC is to no avail, because such allegations suggest something "short of acts that constitute clear and unequivocal abandonment." Respondent testified that she dropped JINC off at Petitioner's house five days a week. Even if Petitioner's mother or a babysitter cared for JINC while he was at Petitioner's house, it is obvious to the Court that Petitioner still intended to, and did, keep regular contact with JINC during this time. Additionally, as Respondent was at work while JINC was at Petitioner's home, and thus, she could not know who was actually caring for JINC and to what extent. Petitioner's intended continued contact with JINC is also illuminated by the fact that Petitioner contacted the Honduran central authority to obtain JINC's return *within days* of JINC's removal from Honduras. As noted above, the Sixth Circuit has instructed that courts may "liberally find 'exercise' whenever a party with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich II*, 78 F.3d at 1065. Accordingly, the Court finds that Petitioner was exercising his custody rights at the time of removal.

Accordingly, the Court finds that Petitioner has proved his prima facie case by a preponderance of the evidence.

11

**IV. Respondent's Affirmative Defenses**

The Court's inquiry does not end upon finding wrongful removal. Once a petitioner has successfully established its prima facie case of wrongful removal, a court must determine whether the respondent has established that any of the Hague Convention's affirmative defenses apply. *See* 42 U.S.C. § 11603(e)(2); *Friedrich II*, 78 F.3d at 1067. These affirmative defenses are as follows: (1) the proceeding was commenced more than one year after the removal of the child; (2) the children have become settled in their new environment; (3) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; (4) there is a grave risk that the return of the children would expose them to physical or psychological harm; and (5) the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."[5] *See* Convention arts. 13(a)–(b); 42 U.S.C. §§ 11603(e)(2)(A)–(B). The Sixth Circuit has considered the affirmative defenses to be "narrow" and "not a basis for avoiding return of a child merely because the court believes it can better or more quickly resolve a dispute." *Freidrich II*, 78 F.3d at 1067. "In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Id.* (citing *Feder*, 63 F.3d at 226).

---

[5] In a portion of Respondent's proposed findings of fact and conclusions of law, she states "For the sake of Respondent's life and the life of her child, this Court should not order the return of the child to Honduras, an extremely violent, crime-ridden country." (Doc. No. 59 at 9). This statement does not support Respondent's claim that return to Honduras would expose JINC to a grave risk of harm; that claim is based on the allegedly violent nature of *Petitioner personally*, not *the general environment in Honduras*. Rather, this statement appears made in support of Respondent's affirmative defense that JINC's "[r]eturn would conflict with fundamental principles of freedom and human rights in the United States." (Doc. No. 22 at 4). This defense is reserved for "the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." U.S. State Dep't Text & Legal Analysis, 51 F. Reg. 10,494, 10,509 (Mar. 26, 1986). Respondent did not put on any evidence or expert testimony in support of this defense. Thus, she is far from meeting her burden to prove this defense by clear and convincing evidence. Thus, the Court will not rely on this defense to prevent return of JINC.

Here, Respondent raises two defenses: (1) there is a grave risk that returning JINC to Honduras would subject him to physical harm; and (2) Petitioner subsequently acquiesced in the retention of JINC in the United States. The Court will explore each defense in turn.

*i. Whether Return to Honduras Poses a Grave Risk to JINC.*

Respondent avers that even if Petitioner proves his prima facie case of wrongful removal, JINC should not be returned to Honduras because there is a grave risk that returning JINC would expose him to harm because of Petitioner's prior violent actions.

To prevail, Respondent must prove by clear and convincing evidence that there is a grave risk that returning JINC to Honduras "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). The Sixth Circuit has adopted a "restrictive reading" of this exception. *Friedrich II*, 78 F.3d at 1068–69 (discussing international precedent that supports a "restrictive reading" of the grave harm exception); *see also March*, 136 F. Supp. at 844–846 (stating that "this exception is truly to be narrowly construed," and courts that have found a grave risk of harm "have generally emphasized that there was clear and convincing evidence to support a finding that the parent seeking the return had seriously abused the child"). The Sixth Circuit has also "acknowledge[d] that courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly." *Id*. at 1067.

At trial, Respondent testified that after she and Petitioner ended their relationship, Petitioner stalked her and threatened her. She testified that on one occasion, when JINC was in the room, Respondent pointed a loaded gun at her, and then at himself while threatening to commit suicide. Respondent also testified that on another occasion, Petitioner showed up at her place of

13

employment and threatened to kill her and himself. She testified that she was in fear of returning to Honduras because of these incidences. Petitioner vehemently denies that he has ever pointed a gun at Respondent or threatened her. Moreover, Petitioner denied that he ever held a gun in front of his son and testified that he "would never do that." Based on its observations during the hearing and its review of the evidence, the Court concludes that neither party's version is appreciably more credible or less credible than the other party's version.

The Court finds that Respondent has not proved by clear and convincing evidence that returning JINC to Honduras "would expose the child or psychological harm[.]" Convention, art. 13(b). Her only evidence of any threatening behavior on the part of Petitioner is her own testimony, which Petitioner's testimony disputed. There was no other evidence, either through witness testimony, physical evidence, or documentary evidence such as text messages or a police report, that tends to corroborate Respondent's testimony. This uncorroborated, hotly disputed testimony is simply not enough to satisfy Respondent's burden of clear and convincing evidence.

Furthermore, these two alleged instances of threatening behavior, even if credited, would not be enough to meet Respondent's burden in demonstrating that returning JINC to Honduras exposes him to a grave risk of harm. Although Respondent testified that Petitioner threatened *her*, Respondent did not testify that Petitioner ever threatened or abused *JINC*. *See Guevara*, 180 F. Supp. 3d at 533 (finding that the defendant did not meet her burden to prove grave risk of harm to the child because "[w]hile defendant submits that plaintiff had an alcohol problem and abused her in the past, she does not allege that plaintiff abused the child."). "To prevail on an Article 13(b) defense, there must be evidence of a grave risk of harm to [the] child, not solely to a parent or some other third party." *Acosta v. Acosta*, No. CIV. 12-342 ADM/SER, 2012 WL 2178982, at *7 (D. Minn. June 14, 2012) (citing Convention art. 13(b)); *see also Charalambous v. Charalambous*,

14

627 F.3d 462, 468 (1st Cir. 2010) ("The relevant inquiry is not whether there would be a grave risk of harm to [the child's mother] if she returned to [the country of habitual residence]; rather, the grave risk inquiry goes to the children."). The Court recognizes the possibility that abuse of a parent can result in a risk of harm to the abused parent's child who is unfortunate enough to be in the vicinity when the abuse occurs; such a child is at risk of indirect and/or unintended harm attendant to the abuse of the parent. But here there has been no showing of any likelihood of such scenario were JINC to be returned—*i.e.*, that long after Petitioner's relationship with Respondent ended, he would abuse her,[6] let alone abuse her with JINC in the vicinity so as to be himself at risk. Although Petitioner did allegedly point a loaded gun at Respondent while JINC was in the room, this action alone does not amount to one of the "extreme cases" in which the grave risk of harm defense may be found. *See Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) ("[T]he court must return the abducted child to its country of habitual residence so that the courts of that country can determine custody. . . . [t]his policy of deterrence gives way to concern for the welfare of the child *only in extreme cases*.") (emphasis added).

Moreover, Respondent has not proven by clear and convincing evidence that the Honduran courts would be unwilling or incapable of protecting the child during the pendency of a custody hearing. Although Respondent testified that the police force in Honduras "doesn't work", this does not persuade the Court that Honduran courts are unable to protect JINC. As the Sixth Circuit explained, "[w]hen we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—

---

[6] With the relationship over, Petitioner presumably would be deprived of the circumstances abusers typically leverage to commit their atrocities: a private space where the abuser has access to the victim without the presence of another person capable (and desirous) of stopping or preventing the abuse. Even assuming Petitioner had, and took advantage of, such opportunities during the course of his intimate relationship with Respondent, that does not suggest he would have such opportunities long after their relationship ended.

15

evaporate." *Friedrich II*, 78 F.3d at 1068. Indeed, the very fact that Honduras has been and remains a party to the Convention counsels against this Court accepting carte blanche an uncorroborated accusation that Honduran courts cannot protect children returned to Honduras pursuant to the Convention. The Court, therefore, does not find that Respondent has carried her burden of establishing by clear and convincing evidence that there is a grave risk to JINC if he is returned to Honduras.[7]

*ii. Whether Petitioner Subsequently Acquiesced to JINC's Removal*

Respondent argues that Petitioner consented to or subsequently acquiesced in the wrongful retention of their child and that she should therefore be afforded the third of the foregoing affirmative defenses under Article 13. Petitioner argues that Respondent waived this defense because she did not raise it in her pleadings. Petitioner's point is well-taken; nevertheless, even if the Court did not consider Respondent's assertion of this affirmative defense as waived, she has not met her burden.

In order for her to prevail on this defense, Respondent must show by a preponderance of the evidence that Petitioner consented to or subsequently acquiesced to the child remaining in the United States. *See Friedrich II*, 78 F.3d at 1067 (citing Convention art. 13(a) and 42 U.S.C. § 11603(e)(2)(B)). Here, the parties stipulated that "Respondent did not tell Petitioner that she had removed the child from Honduras." (Doc. No. 38 at 3). And Petitioner sought assistance from the Honduran Central Authority within days of JINC's removal. *See Freier v. Freier*, 969 F. Supp.

---

[7] Because Respondent has not met her burden of demonstrating a grave risk of harm to JINC if he is returned to Honduras, the Court will not entertain Respondent's request to require Petitioner to obtain a protective order from a Honduran court to ameliorate the grave risk of harm to JINC prior to ordering JINC's return. (*See* Doc. No. 59 at 10-11). The Ninth Circuit recently explained that although such " unenforceable undertakings are generally disfavored" because such conditions imposed are unenforceable by a United States courts, it did "not think that international comity precludes district courts from ordering, where practicable, that one or both of the parties apply to courts in the country of habitual residence for any available relief that might ameliorate the grave risk of harm to the child." *Saada v Golan*, 930 F.3d 533, 541 (2d Cir. 2019). Nevertheless, the Court will not impose any such order because the Court does not find that return of JINC to Honduras will place him in a grave risk of harm.

436, 444 (E.D. Mich. 1996) (finding no consent where, inter alia, petition was filed "within days" of wrongful removal). Accordingly, Petitioner did not consent to JINC's removal from Honduras. Thus, Respondent argued at trial that Petitioner *subsequently* acquiesced to JINC remaining in the United States.

"[A]cquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II*, 78 F.3d at 1070. "Subsequent acquiescence requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Id.* (citation omitted).[8]

Here, Respondent's evidence of Petitioner's subsequent acquiesce was ambiguous at best. At trial, Respondent displayed text messages, in which Petitioner responded with a "thumbs-up" emoji to Respondent's statement that she had made it to the United States. Respondent maintained that the "thumbs-up" meant Petitioner was okay with JINC remaining in the United States. Petitioner contended that the "thumbs-up" meant that Respondent should enjoy her mother's company, and did not imply that he was okay with JINC remaining in the United States. As other evidence of Petitioner's subsequent acquiesce, Respondent read into the record text messages in which Petitioner texted Respondent that his plan was to work hard, get his papers, and come to the United States. Petitioner testified (with adequate credibility, in the Court's view) that he meant here that he intended to come to the United States not to live in the United States with his son, but rather to retrieve his son, and return to Honduras. In another series of text messages, Petitioner

---

[8] The Court sees no reason why this principle should not likewise apply, albeit perhaps with somewhat lesser force, to isolated statements that were made not to a third-party but to Respondent.

17

responded "Perfect" to Respondent's text messages that JINC "would be an important man here [in the United States]."

This emoji and these text messages neither (1) are "statement[s] with the requisite formality" that demonstrate Petitioner's acquiescence;[9] nor (2) display a "consistent attitude of acquiescence over a significant period of time." *Id*. These communications simply do not show, by a preponderance of the evidence, Petitioner's subsequent acquiescence to JINC remaining in the United States, especially in light of Petitioner's consistent efforts to have JINC returned to Honduras. *See Friedrich II*, 78 F.3d at 1070 ("He has resolutely sought custody of his son since that time. It is by these acts, not his casual statements to third parties, that we will determine whether or not he acquiesced to the retention of his son in America.").

Although Petitioner initially sought assistance from the Honduran Central Authority prior to sending these communications, he continued his efforts while JINC remained with his mother in the United States, including by retaining counsel, and eventually filing a Petition in this Court. Petitioner's persistence demonstrates that his communications did not reflect a change in Petitioner's attitude toward JINC remaining in the United States. Certainly, even despite the text messages, Petitioner did not display a "consistent attitude of acquiescence over a significant period of time." *Id*.; *see also Zarate v. Perez*, No. 96–C50394, 1996 WL 734613, *3 (N.D. Ill. Dec. 23, 1996) ("These efforts [in contacting the Central Authority of Mexico] by petitioner continued during the time the child was being retained in this country and eventually led to petitioner retaining legal counsel and filing suit under the Act. All of this conduct exhibits anything but a consent to, or acquiescence in, the retention of the child.").

---

[9] In the Court's view, emojis and text messages are widely perceived to be, and in fact are, generally very casual communications, strikingly devoid of formality.

Accordingly, the Court finds that Respondent has not met her burden to prove Petitioner acquiesced JINC remaining in the United States by a preponderance of the evidence.[10]

**V. Conclusion**

For the above-mentioned reasons, the Court will **GRANT** the Petition and **ORDER** that JINC, the three-year-old son of Petitioner and Respondent, be returned to his habitual residence in San Pedro Sula, Honduras.

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[10] Respondent requests that the Court refrain from issuing an order returning JINC to Honduras until a Honduran court can determine whether Petitioner was actually exercising parental authority at the time of removal. (*See* Doc. No. 59 at 9-10 (citing Convention, art. 15)). Article 15 of the Convention provides:

> The judicial or administrative authorities of a Contracting State *may*, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State. The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination.

Convention, art 15 (emphasis added). Nevertheless, the Court also has an obligation under the Convention to make an expeditious decision. According to the record, no proceedings regarding custody of JINC have been initiated in Honduras. The Court concludes that a Honduran court, due to its lack of experience or familiarity with this matter, likely would both need some time to get up to speed and be no better situated to rule (at a date even further removed from the relevant events) on the issue of exercise of parental authority. Therefore, the Court declines Respondent's request to stay this matter until a Honduran court determines whether Petitioner was exercising his custody rights.